IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

```
HOUSTON FLEETING SERVICES LLC §      CASE NO. 4:24-CV-02705
                              §      HOUSTON, TX
VERSUS                        §      FRIDAY,
                              §      JULY 26, 2024
M/V YANGZE et al.             §      10:11 AM TO 11:07 AM
------------------------------------------------------
RICHARD ANCAR                 §      CASE NO. 4:24-CV-02739
                              §
VERSUS                        §
                              §
M/V YANGZE et al.             §
```

MOTION HEARING

BEFORE THE HONORABLE DENA H. PALERMO
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

FOR THE PARTIES:              SEE NEXT PAGE

COURT REPORTER:              BRITTANY NICKLAUS

COURT CLERK:                 CAROL FELCHAK

TRANSCRIPTION SERVICE BY:

Veritext Legal Solutions
330 Old Country Road, Suite 300
Mineola, NY 11501
Tel: 800-727-6396 ▼ www.veritext.com

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

APPEARANCES:

FOR THE PLAINTIFF               LISKOW LEWIS
HOUSTON FLEETING SERVICES:      David Reisman
                                Michael Golemi
                                701 Poydras Street
                                Suite 5000
                                New Orleans, LA 80139
                                504-556-4175

FOR THE DEFENDANTS              ROYSTON, RAYZOR, VICKERY &
LADON SHIPPING:                 WILLIAMS, LLP
                                Eugene Barr
                                Dimitry Georgantas
                                1415 Louisiana Street
                                Suite 4200
                                Houston, TX 77002
                                713-224-8380

FOR THE PLAINTIFF               ZEHL & ASSOCIATES, PC
RICHARD ANCAR:                  Justin Warner
                                2700 Post Oak Blvd.
                                Suite 1000
                                Houston, TX 77056
                                713-491-6064

ALSO PRESENT:                   TOM LIGHTSEY

HOUSTON, TEXAS; FRIDAY, JULY 26, 2024; 10:11 AM

THE COURT:  Good morning, everybody.  I call the case of HSS, which is Houston Fleeting Services v. M/V Yangze.  And that's Case Number 4:24-cv-02705.  And I also call the case of Richard Ancar v. M/V Yangze 7 et al, and that's 4:24-cv-02739.

So can I have the appearances for counsel first in the HSS case and then in the Ancar case?

MR. REISMAN:  Sure.  Good morning, Your Honor.  This is David Reisman.  And I've got my law partner, Michael Golemi with me from Liskow Lewis.  We represent Plaintiff, Houston Fleeting Services.

THE COURT:  Thank you.

MR. BARR:  Good morning, Judge.  Eugene Barr and Dimitry Georgantas from Royston Rayzor for the vessel claimant, Ladon Shipping.

THE COURT:  Okay.

MR. LIGHTSEY:  And, Your Honor, my name is Tom Lightsey and I do not have a party in either of these actions, but we do represent Captain Jefferson, who was the pilot on the M/V 7.  So we have an interest in these proceedings, if we may attend.

THE COURT:  Yes, okay.  Anybody have an objection to him attending?

MR. REISMAN:  No, Your Honor.  Thank you.

THE COURT:  All right, thank you.  All right.

So in the Ancar case?

MR. WARNER:  Yes, Your Honor.  Good morning.  This is Justin Warner on behalf of Richard Ancar.

THE COURT:  Okay.  And do we have any defendants appearing in the Ancar case?

MR. WARNER:  No one has made any appearance, Your Honor, but I believe it's all the same defendant counsel here.

THE COURT:  Okay, got it.  All right.  Thank you for joining me this morning.  We've got a lot on our plate.  Who would like to start?

MR. REISMAN:  Your Honor, good morning.  David Reisman on behalf of Houston Fleeting Services.  It would probably make sense for me to start.  I kicked this off with the lawsuit, the first lawsuit in this matter.  There are now I think four, a total of four; three in federal court, one in Harris County, all arising out of the same set of facts.  And then I subsequently filed this motion for expedited hearing on a motion for expedited discovery.  And I'll address that if you will.  And I don't know how much background the Court wants. I'm happy to provide as much as you'd like.  I'll start and if you think I'm going too far, I'm happy to --

THE COURT:  Yeah.  Hold on one second.  Let me ask a question.  In the -- has the death case been brought yet?

MR. REISMAN:  It has not.

THE COURT:  Okay.  And we know who it is, obviously,

who died.  Has the body been recovered?

MR. REISMAN:  It has, Your Honor.

THE COURT:  Okay.  All right.  Okay.  And so three cases in federal court.  Does that include the limitation action?

MR. REISMAN:  It does.

THE COURT:  Okay.  So really then we've got HSS and Ancar have filed suits in federal court and then the vessel has filed the limitation action in federal court.  And then in Harris County, that case is the other crewman who was injured?

MR. REISMAN:  No, Your Honor.  I believe that was also Mr. Ancar.

MR. WARNER:  Yes, Your Honor.  This is Justin Warner.  That was filed on our behalf as well against the master of the vessel, all the various Yangze interests, as well as against Houston Fleeting Services.

THE COURT:  Okay.  All right.  And that case is not going to be removed to federal court?  I guess there's no basis for federal jurisdiction in that particular case?

MR. WARNER:  It will likely be stayed pending the limitation proceeding once that gets up and going.

THE COURT:  Okay.  All right.  And on the limitation proceeding let me just ask this question.  Just trying to put everything in a perspective here.  On the limitation action, are you thinking that you want to file a motion, consolidate,

and have all three cases that are in federal court and whatever -- anything else that gets filed in federal court put into one case?

MR. BARR:  I believe that's how it works out, Your Honor.

THE COURT:  Okay.

MR. REISMAN:  It's no secret that Houston Fleeting Services is also planning to file a limitation action in the Southern District.  So I think the two limitations and any other existing suits would all be consolidated into one proceeding.

THE COURT:  Okay.  And being that I think I have the low number, the consolidation is going to end up being in front of me.  And that's fine.  I'm just thinking that if we are going to do that, that we should do that sooner rather than later.  And obviously I can't order you to do things on cases that haven't yet been filed.  But especially given the request to have expedited discovery, it seems to me that the quicker we get all the cases on file and consolidated into one case, everything will run more smoothly once that's done.

MR. REISMAN:  Understood, Your Honor.  I think our plan is to file the limitation I would think early next week.

THE COURT:  Okay.  All right.  And then I would suggest that when you file that, of course you're going to say there's related cases.  But that doesn't always mean that they

get set in the same court.  But both of you get motions to consolidate on file as quickly as you can next week so that we can get those ruled on.

The motions to consolidate should be ruled on by the lowest court number, which would be me.  So once those are filed, I'll just make the necessary -- as a matter of court comity we just talk to the other judges to make sure that nobody wants to keep the case.  But I can't imagine anybody is going to want to keep it.  So we'll end up then entering the orders of consolidation and getting everything in this court as quickly as we can so that we can then just run things more smoothly.  And I think that makes the most sense.  Okay.

So now, Mr. Reisman, go on and tell me -- tell me your story, whatever you want to tell me.

MR. REISMAN:  Sure.  So,  Your Honor, last week, last Friday there was a collision on the Houston ship channel.  My client, Houston Fleeting Services, owns and operates an inland towboat called the Miss Peggy, who was proceeding inbound.  The Yangze 7, a foreign-owned, operated, and crewed ship, was proceeding behind the Miss Peggy, also inbound.  And around Light 126, the Yangze 7 in its attempt to overtake the Miss Peggy actually ran direction into its stern, rolled its bow into the water, flipped on its side and then spun it around, causing it to capsize and sink.

One crew member tragically remained inside and was

unable to get out.  He perished.  His body was recovered a few days later.

Another crew member was also trapped in that same area.  He got out.  It took some time, but he did get out.  That's Mr. Ancar.

The other three crew members were able to get out a little more quickly.  All four of the survivors were picked up and rescued by a tugboat that happened to be following another passing vessel.

If the Court has any interest, this is one of those rare cases where the incident was captured by pretty high-quality video, the vessel traffic system.  We have it.  I can play it if you want to watch the two minutes of it to get some background.  Or if that's unnecessary, I'm happy to proceed.

THE COURT:  What I would like you to do is to send that video to my case manager so we can keep it in the file.  And I will watch it after the hearing.  But I don't want to take up that time to do that now.

MR. REISMAN:  Sure, understood.  So the incident occurred.  The Coast Guard and the NTSB as you might expect began an investigation on Sunday.  My client, Houston Fleeing Services, was designated a party in interest.  I attended the interviews of the ship's crew, four crew members in particular.  The captain, the second officer, the helmsman, and the bosun.

To give you some context, the bosun was standing up

on the bow of the ship.  He was designated as the ship's lookout.  His responsibilities were to identify any vessels coming in proximity of the ship, relaying that information by radio back to the bridge so that the navigation officers could take that into account.

On the bridge itself was the helmsman.  He was actually the one steering the ship, taking orders.  Supposed to be taking orders from his captain, although he indicated he was not.

Also interviewed was the second officer.  The second officer was also on the bridge on watch.  His responsibility was to monitor the ship's navigational aids and electronics to identify any potential vessels that could interfere with them getting in their way that they needed to make passing agreements with, et cetera.

The captain was also in the bridge.  He had overall command of the ship.  There was a compulsory pilot on board from Houston Pilots.  He was not in command of the ship.  The captain is and was.

So the Coast Guard and the NTSB interviewed those four crew members.  I attended those interviews.  During the interviews, they confirmed that they did not see the Miss Peggy, even though it was right in front of them in clear daylight, no visibility issues.  And so the lookout, the bosun spotted it about 20 to 30 meters ahead of the ship, upon which

it was far too late for the ship to avoid them.  The ship had a legal duty as the overtaking vessel to avoid the Miss Peggy.  Despite that obligation, it did absolutely nothing to do so.  No radio contact, no whistle.  No evasive measures were taken by the ship.  It ran directly into the stern of the Miss Peggy.  And as I described earlier, caused it to capsize and sink.

Those interviews conducted by the Coast Guard and the NTSB were recorded, audio recorded.  However, those are not admissible.  They can be used to impeach the witnesses later, but that assumes that those witnesses are going to give testimony in this case in the form of deposition or trial testimony.

The ship, as I indicated -- and I forget and I apologize.  It's either Chinese or Singaporean owned.  It's registered in Liberia.  The crew members, the four that we know of that we're interested in are all Chinese nationals.  The ship was coming into port here in Houston to load petcokes at the Kinder Morgan facility in Baytown of Channelview area.  I think they are partially loaded.  They for some reason come off of that dock and stop loading.

The ship's currently under arrest by my client.  Mr. Ancar is requesting to arrest it as well.  The Coast Guard has it under detention.  The ship, that is.  The Customs and Border Protection has the crew under detention.  We don't know how long any of that will last.  The limitation that was filed by

the ship presumably at some point in the relatively near future will result in the ship being released from its arrest and will prevent presumably Mr. Ancar from being able to arrest it.  We don't know when the Coast Guard is going to release it.

So we have four individuals.  There was a 22-man crew we understand on board the ship.  We're not interested in the other 18.  We only want the four that were actively on watch and involved.  There were others who were on watch, but we are only interest in those who were involved in this collision, have critical facts, and who are Chinese nationals preparing to depart for Turkey as soon as the ship is finished loading and has been released.

Once they leave, there's no guarantee -- in fact, I would be foolish to think there was even a real opportunity for me to be able to compel them to give testimony in this matter.

Now, I don't want to ignore the fact that counsel for the vessel owner has generously suggested that they will agree to bring these four individuals back and make them available for a deposition in the near future in Houston.  And I don't ignore that, but I also see the problem with it, which is namely that first off, the vessel owner -- Ladon I think it's pronounced, I apologize if I am mispronouncing it -- does not employ the crew.  The captain of the ship told the Coast Guard and the NTSB during his interview he was employed by another entity, Sinoships.  A separate entity from the vessel owner.

So how the vessel owner can force the individuals after they've left the United States to come back, I don't know. Regardless, whether they remain employed by Sinoship, whether they remain having any kind of relationship with the vessel owner, that's all unclear. And I believe that counsel for the vessel owner has good faith, has represented that they will make the efforts to bring these guys back. But you can't force somebody to come back. They could quit, they could be fired, they could just say no.

The other thing that I haven't mentioned is that the Coast Guard made it clear over the weekend and continuing through Monday that there is the possibility of a criminal referral in this matter. The pilot, his counsel is on board, that was on board the ship, I understand that he has invoked his Fifth Amendment rights and refused to be interviewed by the Coast Guard and the NTSB. The crew was certainly aware of that through the counsel for the ship owner. And so the idea that these individuals are just going to voluntarily come back to the U.S. and submit to depositions also to the jurisdiction of potential criminal ramifications, that's something that I can't rely on a case of this magnitude.

The decisions that we have cited show that it's up to the court. The court has the ability under the right facts to be able to compel immediate depositions of the crew. We think that's appropriate here.

Counsel for the vessel owners has referred to one of those cases in which there was a seemingly quick limit of six hours total for five witnesses.  We don't know the facts of that case.  That case is not available on Pacer, the complaint itself.  So we don't know the facts.  But it's probably unlikely that it involved a fatality or potential serious personal injury claims and a sinking and total loss of a vessel.

So we just think that under these circumstances that it's critical that we be given an opportunity.  Frankly, I don't want to take the depositions this quickly.  And I recognize as counsel to the vessel owner has said that other parties are going to come into this case and they are going to want these depositions also.  So even if I take them, they'll want more, and frankly, I'll want more.  When we get their personnel files, training history, the vessel's policies and procedures.  But there is a real genuine risk that if they are not deposed now, we will never get testimony.  And that would be a tremendous miscarriage of justice in a case of this magnitude, which has serious facts.  And with admissions by the crew already to the Coast Guard and NTSB that they frankly just were not doing what they were required to do.

And so for us, it's -- you know, there are lots of arguments, there's a lot of things that can be thrown at the wall.  There's been some rhetoric that I'm hoping we can tone

down in the briefing.  We don't need to go there.  I respect counsel's efforts to try and bring the crew back, but unless the Court orders them back and there's some real teeth to that and a real sanction against the vessel owner if they don't bring them back, I just don't see how justice can be served by letting these individuals leave the country with the real risk that they never come back.

THE COURT:  Okay.  What kind of order are you thinking the Court could enter that would have real teeth to it that would make them be able to bring them back?

MR. REISMAN:  We've thought about that a lot.  And I think there's potentially and maybe even likely there would be an adverse inference if they don't come back.  But I think having the Court as opposed to their non-employer say we're going to bring them back, you know, I think that there would have to be an impact on their ability to limit.  And I think if they don't bring these witnesses back, it would be critical to the issue of limitation of liability that they would waive their right to limit and they would waive their right to defend the claims.

THE COURT:  That's pretty serious.

MR. REISMAN:  I agree.

THE COURT:  I think they probably -- in the face of that order they'd say take the depositions two or three times.

MR. REISMAN:  I would think so.  I agree.

THE COURT:  That's what I'd say.

MR. REISMAN:  I agree.  But on the other hand -- and that's why I think if you look at this and you keep it in the context, you know, the equitable nature of these admiralty proceedings, there is the risk to all of the parties, not just my client, but certainly Mr. Ancar and the other crewmembers who are very likely to be in this case soon.  You know, the flip side is that if these crewmembers are allowed to leave and never come back, then effectively that's how draconian the impact would be on all of us.  We never see these people.  We may get some limited inference that the vessel owner will fight and say they're not our crew members, we don't have control over them.  We couldn't force them to come back.  You can't get an inference against us if we don't control those crew members.

So we could literally -- the options here are that the parties that claim to be victimized by this conduct lose the right to prove their case or the party that claims they can control these witnesses says yes, we will stand by our offer. Again, an offer to bring the crew members back that they can't require and if they're not willing to face those strict penalties for it, that's a pretty hollow offer in my opinion. And I think these attorneys are in good faith, they're trying to find a resolution.  And I would like to find that.  And to me that's the way to resolve this.

Otherwise, I don't think they're going to say yeah,

we offered to bring these guys back knowing we couldn't.  And so if they don't come back, we shouldn't face any liability for that.  I think they've made the offer, they've put that in their brief to you probably six or seven times.  They're really primarily standing on that issue.  And so if we're going to go that route, I just think there has to be a real sanction against them if they fail to comply with it.

THE COURT:  Right.  And I thought about that as well, although I didn't think about the sanction you thought about.  I thought more in the lines of getting them to post more money, which I don't know how you calculate the worth of that.  So that's a problem in and of itself. Yeah. Okay. Anything else that you wanted to say?

MR. REISMAN:  No, Your Honor.  I'm happy to address any questions after opposing counsel speaks, but I think that's it from me.

THE COURT:  Oka, thank you.  All right.  So, Mr. Barr, are you going to argue?

MR. BARR:  Good morning, Your Honor.  Eugene Barr for the Claimant, Ladon Shipping, subject to our restricted appearance in the limitation of liability petition that we have on file.

But before jumping into the motion itself, just very briefly.  The Coast Guard and NTSB investigation of course has interviewed the personnel from the Miss Peggy as well and the

captain has specifically stated in his interviews that he did not even see the Yangze 7 until after it made contact with his vessel. He was not monitoring either visually or with his navigational equipment. And the last time he actually saw the Yangze 7 was about a half an hour before the incident. So there are questions all around on this point.

THE COURT: Yeah. I saw that in your response. And yeah, it makes it a little bit of a different case. But what the impact is going to be, only time will tell.

MR. BARR: But to the more germane items, as we have said multiple times in our response as Mr. Reisman said, we are prepared to bring these four crew members back. They are currently employed on the vessel. It's a beehive of activity. They would not be able to leave the vessel for these depositions and would not be able to get (indiscernible) pass. We have looked into that. We are aware additional claimants will appear. And there is basically a hundred percent chance that folks are going to be asking for a redo of all of this.

Every maritime act that pretty much we're involved with -- I mean, unfortunately given the size of the vessels, there's either going to be a spill, serious injuries, things like that. This case is not unique. What's unique about it for me is that I've never come across a case where we haven't been able to come to an agreement on being able to bring the crew members back.

The crew members are under the structure control of Ladon. Due to the commercial relationship it has with these other entities, we are able to get them to come back.  And we discussed this with our client quite a bit before we made the representations to the Court.  And we understand that an adverse inference would likely result if they did not appear as we are representing that our client is willing to make sure that they do.

I'm not sure about the limitation going with that sort of (indiscernible).  I just would have to look into the statue on it.  But we certainly appreciate that there would be serious consequences if they did not show up as our clients represent.  We just want to be able to do this in one shot to where it's literally that.

Oftentimes, you know, we've worked with Mr. Reisman's firm before and the maritime counsel.  We're happy to share documents earlier on in order to let the folks get prepared for these depositions.  We just want to be able to do it in an orderly fashion for the safety of the vessel for its operation in order where we can get it done in one opportunity.

So our limitation on file there's going to be -- once the order is signed, it's going to take about four weeks for the publication in the chronicle to be circulated to all the claimants to come in.  So there's going to be that.  And then if anyone does appear, an exchange of discovery.

We're thinking we could get this done four months from now.

THE COURT:  In four months to --

MR. BARR:  At the latest.

THE COURT:  To present the crew members in four months now?

MR. BARR:  To make sure that everybody else is at the table to where we don't have to redo anything.  But certainly open to adjustment on it.  But that was conservative just to make sure that everybody --

THE COURT:  And how long are the crew members under contract with your client?

MR. BARR:  The earliest ones I believe are the end of the year.  The captain joined in Antwerp, which was right before the ship came into Mobile and then Houston.  So these contracts are typically around ten months before they depart the ship.  So we have plenty of time with the schedule that we're seeing to be able to get this done.  But there are some steps with the limitation, visa applications, things like that.  We've done it all before and we're able to get that process.  But there are some considerations to just make sure that we've got the table properly set for whenever they can come tack.

THE COURT:  What about the impending or the possibility of criminal charges in this particular case?  I don't know that that has been an issue in other cases, but

that's certainly -- a threat of criminal charges would certainly be a reason that somebody would not want to come back, would not agree to come back.  And I hear what Mr. Reisman is saying is you cannot really force somebody to come back.  They're not indentured servants.

MR. BARR:  As far as I know there has been no representation to us by Coast Guard, NTSB that there's a criminal inquiry for any of our crew.  And I do also note that whenever the investigators came to the ship to interview our personnel, it was only civilians.  But Coast Guard -- just regulatory personnel.  But whenever Mr. Reisman's clients were interviewed, there was a criminal investigator actually there.

So we have not received any indications from Coast Guard at this time that they are looking into anything criminally with respect to our crew.

MR. REISMAN:  Judge, if I can, I can tell you that -- I can represent to the Court that the Coast Guard has told me that they are evaluating the ship's crew, the Yangze 7's crew for potential criminal liability.  I'm happy to do that on the record.  They've also said that they are not evaluating the same thing with respect to the crew of the Miss Peggy.

THE COURT:  Okay.  So -- sorry.  Your understanding is that the criminal charges are being focused on the Defendant's crew as opposed to your crew?

MR. REISMAN:  I think that's a little stronger than I

would say because right now what the Coast Guard has said is that they are evaluating whether there will be criminal charges. But what they've told me specifically was that they were looking to the ship's crew for that and not to the Miss Peggy's crew. But they have not indicated that they will file charges, but that they were evaluating whether that would be something that would happen down the road.

MR. BARR: And again, they've given us no indication of that.

THE COURT: Okay. Okay. Anything further you want to say, Mr. Barr?

MR. BARR: I believe that covers everything that I had unless the Court has any questions.

THE COURT: Yeah. The first question I have is my understanding is that you're working to get the ship released. What are you doing in that regard and what kind of timing do you have in terms of when it would possibly be released?

MR. BARR: So with respect to release, of course the vessel is under arrest due to this proceeding. We'll need limitation of liability petition signed off on. So we're working on that. It's currently pending before Judge Bennett.

THE COURT: He referred it to Judge Bryan.

MR. BARR: Oh, okay. And so that's one step. Coast Guard has indicated that they may want another round of interviews, but that's to be determined at this point. The

vessel still needs to complete its loading of cargo here.  Due to berth availability, the rainy weather conditions that we've had here lately, it's a bit unclear as to any specific dates at this point.

THE COURT:  Okay.  And what is the -- do you have off the top of your head, do you know what the daily rate of charges it costs the company for the vessel operate and pay berthing fees or whatever?  What is that cost running them?

MR. BARR:  I do not know that offhand.  Mr. Georgantas is here.  I don't know if he has that information.

MR. GEORGANTAS:  May I, Your Honor?

THE COURT:  Please.

MR. GEORGANTAS:  We've already received an invoice from the bulk terminal where we were located to load the partial cargo that we have now.  And that is in the range already of $250,000.  We --

THE COURT:  For how many days?  Yeah, okay, the daily.

MR. GEORGANTAS:  It was I'm estimating five, six days.  Let me put it this way, Judge, it's about $4,500 per hour.  (indiscernible).  And that's what they've sent us already.

We are now on a lay berth, which is like a standby berth, pending availability of the load berth.  So we're being charged for that.  I don't know how much, but I can find out.

That would be a daily rate. And of course we have the vessel's hire rate, the charter hire that the owner would collect from the charters that is now higher because the vessel is not working due to the circumstances.

I'm not sure what the daily rate of that is, but I would not be surprised if it's in the $20,000 to $30,000 a day. That's a Georgantas estimate, Judge. But we can certainly circle back on that.

That's more or less the universe of costs as we speak today that I know of.

THE COURT: Okay. Crew costs, which I would imagine that you're going to be paying anyway.

MR. GEORGANTAS: That is correct.

THE COURT: Okay. Mr. Reisman, you wanted to say something?

MR. REISMAN: If I could just address that. Just a point of clarification. We specifically when we arrested the vessel did nothing to prevent them from loading and moving within the district. So the delays and any delays there have been have had nothing to do with the arrest at all.

THE COURT: Yes, I saw that in the orders and in all the papers that were filed that you were agreeing to them doing normal operations, just not leaving. So at some point if all of this -- if everything gets unloaded and they are completely finished and they're still under arrest, it's going to cost the

vessel a certain amount of money to just sit still.  And so what I'm trying to get a handle on, Mr. Georgantas -- and I know it's not always easy to put your hands on that figure and you maybe don't know it off the top of your head.  But something that you can provide to the Court.  I would like to know how much it's going to be costing on a daily basis.  Because that's going to figure into the calculation a little bit about when these depositions go forward if they're going to go forward on an expedited basis.

MR. GEORGANTAS:  Clarification, Judge.  We are loading, not unloading.

THE COURT:  Okay.

MR. GEORGANTAS:  I understand the question.

THE COURT:  Okay.

MR. REISMAN:  Your Honor, could I raise one more point?

THE COURT:  Yes.

MR. REISMAN:  So I represent the State of Maryland in connection with the Dali case with the Francis Scott Key Bridge in Baltimore.

THE COURT:  Oh, nice.

MR. REISMAN:  Don't tell my wife that.  We faced a similar issue there.  And the idea was at that point the ship was ready to depart Baltimore, was going to Norfolk, Virginia. Nobody wanted to see the crew leave.  They wanted them there.

And we worked out a deal.  The critical crew members stayed behind.  There was a criminal -- obviously criminal implications in that one as well.  But the crew that were needed, not the entire crew, were taken off the ship and they were kept there.

So the idea of what the expense would be for the ship to remain is unnecessary.  We're not interested in the ship remaining.  We've inspected the ship.  As far as we're concerned once they post the bond, which they haven't done in a week, they haven't done that -- not a week, but close to a week now.  They haven't posted a bond or made any effort to get the ship released, which they could.  There was some gamesmanship in terms of trying to get a letter of undertaking and voluntary security.  They told us the ship was worth $14 million, insisted on that.  We told them no, it's worth $22.5 million because we had it appraised.  They then filed a limitation where they said it's worth $23 million even though they insisted it was 14.  And they wouldn't give us security for more than $14 million.  So there's been a lot of gamesmanship.  But the reality is --

THE COURT:  They're just doing their job.  They're defending their client.  They're doing what they're supposed to do.

MR. REISMAN:  I'm merely (indiscernible).  But I think it's important for the Court to have the full

understanding.  They could have had the ship released.

But the practical problem, the impediment for them is that the Coast Guard has the ship under detention.  There's a very basic piece of information or set of information that the Coast Guard always wants, the NTSB wants, and frankly the parties want.  There's a piece of equipment on board the ship called the voyage data recorder.  It has audio recordings of everything that happens on the bridge.  It has playback of the electronic charting system, the radar, all of those things that are so critical to a case like this.  We're now a week after the incident.  My understanding is the Coast Guard requested that last Friday.  And as of yesterday afternoon, the ship still has not been able to provide that.  They cannot leave, everything else aside, until that's been resolved.  They gave partial data, but not full.  The Coast Guard is probably going to wind up having to pull that voyage data recorder hard drive off of the ship which will render the ship incapable of leaving until they can replace it.

So the timing -- we could get these depositions done before the ship could leave.  Because, A, it hasn't even attempted to post security.  B, the Coast Guard has got it under detention.  The crew can't leave because Customs and Border Protection has them locked down.  So we can take the depositions without creating any undue hardship on the vessel, its crew, its owners, its employers, whoever.  And I think

that's important.

The other thing is we've heard that this is a working crew.  I think Mr. Barr used the phrase it's a beehive of activity.  My understanding is the ship is now not loading.  It came into port to load.  It loaded partially.  And for reasons that Mr. Georgantas described as non-legal moved it off of the berth where it's just sitting there waiting for the berth to reopen.

We have a crew that works typically eight-hour watches.  And there's no activity on the vessel.  They are standing by waiting to move within about a hundred meters away.  So there would be no disruption of the crew.  We're only talking about four, one at a time we could do it.  So there's no delay of the ship, no delay of the crew, no impact on the ship, no impact on its operations.

The only impact will come the longer they delay allowing the depositions to happen.  Then maybe we'll get into a position where the ship would be cleared to depart.  But right now that's not a reality.  And we could do this with no financial or other impediment to the ship owner.

MR. GEORGANTAS:  Your Honor, may I respond to a couple of --

THE COURT:  Sure.

MR. GEORGANTAS:  (indiscernible) Mr. Reisman.

THE COURT:  Go ahead.

MR. GEORGANTAS: His reference to previous cases the Dali, I can represent to the Court that we've had in the last 10 or 15 years two or three major marine casualties. And in all of those cases we came to an agreement to bring the crew back at a basically mutually convenient and agreeable time for all the parties (indiscernible), that we would do that at our cost and expense and we would bring them back to Houston. And in all of those instances, that is exactly what we did.

With respect to the VDR information that Mr. Reisman was addressing, we are in the process of providing that information as there were some difficulties finding a technician to come on board for that particular system. So we are in the process of providing whatever information was on that to the Coast Guard and the NTSB.

The loading part is simply -- it could be any day. It's up to the loading berth to let us know. There are other vessels in rotation. Whether -- we can not predict that. And I don't think anybody here, Mr. Reisman or ourselves can tell you that the ship will be sitting around for days waiting to load. You know, when the terminal is ready, they will tell the agent to bring the ship in and she will go in to load the balance of her cargo. So that is our response.

In terms of the bond, we have filed a limitation. We understand now it's before Judge Bryan. And when (indiscernible) the order, that essentially is the bond and the

vessel would be released.

I don't know if Mr. Barr wants to add anything.

THE COURT: I'm sorry, just let me ask you a question. When you say when she signs off the order, that's the bond, what does that mean?

MR. GEORGANTAS: We provided security with our pleadings, Your Honor. It's in the form of a P&I (indiscernible) letter. It's one of the protection and indemnity (indiscernible) that's part of the international group. That was the security that we had offered to Mr. Reisman's client. And putting aside the discussion about the evaluation of the vessel and some other items in the language, they were fine with the entity that was providing the security. And this is typically what happens in these cases.

THE COURT: It's like a letter of credit basically?

MR. GEORGANTAS: We call it a letter of undertaking, but yes.

MR. REISMAN: And Houston Fleeting Services has no objection to a letter of undertaking from the P&I (indiscernible) in the right amount (indiscernible).

THE COURT: Okay. That's a relief. Okay. So I think both sides have made very good arguments. And it's a balancing act here, obviously.

I think that the thing that is the tipping factor for me is the threat of the criminal charges. I think that given

the threat of the criminal charges, even though I understand that the Defendant was not told the same information from the Coast Guard that Mr. Reisman has been told, the fact that there is a potential threat of criminal charges to be brought against the crew members would mean that it might be impossible in a very short period of time for them to come back. Because if they come back, then they're going to be thrown in jail or arrested or whatever. And I don't take that lightly.

MR. BARR: Your Honor, if I may very briefly. In our experience, we also deal with marine environmental pollution cases where those have criminal charges. We enter into these types of agreements with the federal prosecutors all the time where owners will represent that these crewmembers, they're allowed to come home and we'll bring them back. It's a common thing with federal prosecutors. And they're called MARPOL cases, environmental pollution where they say the pollution emanated from a ship.

So even in the criminal realm, it's something that we've done routinely with prosecutors throughout the U.S.

MR. REISMAN: I think the marine pollution claims are a little bit different from a seaman's manslaughter claim.

THE COURT: Yeah. And I'm not familiar with all of these different cases and all of these different scenarios. But there certainly have been instances where expedited discovery has been ordered. I understand your argument, Mr.

Barr, that in those cases the Defendant was not being cooperative. And I appreciate the fact that you're being cooperative and that you are trying to work out or have tried to work out some kind of an agreement with the Plaintiffs. But they're not agreeing.

So in this instance when no one can predict anything and it's just no one has a crystal ball, I think that the tipping scales tip in favor of allowing the depositions to go forward. We are talking about only four crew members. And so there are going to be a limited number of depositions. I am not going to put the same kind of time restrictions on, although it does not seem to me that at this point you need six hours' worth of deposition from each witness.

So, Mr. Reisman, what is it that you were thinking you would require?

MR. REISMAN: That's hard to say. I agree that we probably don't need that long. The one consideration I have is that the crew members speak Chinese. The captain spoke English well enough that he served as the translator. But my suspicion, strong, is that they're going to want a translator for all four. They've said that already in fact.

THE COURT: That slows it down. Yeah.

MR. REISMAN: It slows it down considerably, correct. So it's harder for me to put almost an arbitrary time limit on it with that in mind. We don't know the translator, we don't

know how quickly that will happen.  But we have a relatively limited subset of questions that we would like to ask that go really to the heart of the issues.

I do agree that if the witnesses are ever back here, whether by agreement, by court order or otherwise, other parties are going to want to depose them.  And we're willing to leave a lot of that to the next time.  But right now the critical information that must be retained, we want to do.

So I would think that we'd probably be looking at maybe three hours per witness under ordinary English-speaking, non-translator.  But that's just my estimate.

THE COURT:  Okay.  So there are translators -- believe me, we have translation problems all the time.  And the ones that are the regular translators, they do simultaneous translation.  And that really doesn't slow it down nearly as much.  And when you have a very experienced translator, they can do that.  Whereas when you have translators that are not as experience with court proceedings, then they're waiting and it's a lot of interruption, and you don't really feel confident that they are translating exactly what you said because they, you know, let you say three paragraphs before they actually translate it.

So I would strongly recommend that if we're going to have to have these things translated, that we find translators -- and I don't know whose obligation it is to supply this

translator, but that you find translators who are very experienced and can do the simultaneous translation. Otherwise, it will not only slow down the process, but it will also create questions about whether they're really translating it verbatim. And in these kinds of depositions having a verbatim translation is going to be very critical. Because you don't want somebody interpreting what the answer is and giving an answer that's not accurate.

MR. REISMAN: Agreed. We have an additional overlay even if we -- and I hope we -- I think we've tried to identify some very experience, qualified, certified Mandarin translators. We have to have somebody that won't have the real maritime background. So the nautical terms that are likely to come up in the course of the deposition, that's going to be a challenge. And we know that's just going to take more time. Things will have to be explained rather than just using basic maritime terminology.

So again, all that is going to come into this mix here in terms of how quickly the depositions can be concluded.

THE COURT: So that's not necessarily a bad thing because you're going to be playing those depositions for people who are not familiar with the maritime language. You know, when you say aft and fore and whatever else it is, you know, people don't know what you're talking about. Okay.

Given that I am going to allow the depositions to go

forward, what I would like for you to do is to now confer and agree to some kind of a schedule on that. And then come back with a proposed order for the court to sign. Can you guys do that?

MR. REISMAN: We can. I have raised that issue and tried to get that resolved on Wednesday in the event the Court ruled this way. And I know there was some challenges. They were unable to get what they needed. So hopefully, Dimitri, I think you'll probably be the point of contact. We can get that resolved. Do you know what you need to know now? We'll get on that and get something to the Court right away.

MR. GEORGANTAS: That's fine, Your Honor.

THE COURT: Okay. All right. So anything else that we need to rule on in this case?

MR. BARR: Yes, Your Honor. The second component of that Cargill case where if the requesting party wanted to have a second bite at the apple, that they were going to need to show good cause. So we're just hoping that -- you know, they're pushing hard for this and that they are not a couple of months down the road they're going to say, oh, we need to just do it full on all over again. You know, that the good cause requirement would be looked at.

THE COURT: Do you have an objection to that, Mr. Reisman?

MR. REISMAN: I do. And I mentioned this earlier. I

mean, there's going to be written discovery. We're going to get training policies, we're going to get their personnel files, the safety management (indiscernible). So we'll want that. But I also know that all the other claimants that are to come -- you know, (indiscernible). There are going to be more.

THE COURT: Right.

MR. REISMAN: I think this is to lock down the critical information that came out in the Coast Guard and NTSB interviews, reserve that. And then the case can proceed accordingly. And if their witnesses are not produced later, then adverse inference, whatever flows from that flows from it. But we would expect that. And that's why, again, if this was my one and only shot at them, I would tell you -- I wouldn't have said three hours. We're just trying to get in and get out surgically on the issues that have already been addressed that we just want to preserve. So I do object.

THE COURT: Mr. Barr?

MR. BARR: Again, I think it's worth looking at good cause down the road. I think Louisiana courts --

THE COURT: Yeah, but I guess the question is what makes up good cause. So if at this point we're having expedited discovery because we're afraid these people will never been seen again so he's getting the limited information that's currently available and then you produce a whole bunch of documents that raise a whole bunch of other issues that

would require the taking of depositions, doesn't that create good cause just in and of itself?  What is the good cause standard that you think I would be looking at later down the road?

MR. BARR:  Just that we would be dealing -- we don't want a redo to cover the same --

THE COURT:  Oh yeah.  Well, that's -- you know, clearly he is not going to get another bite at the apple asking the exact same questions.

Now, other lawyers for other clients -- like if somebody signs up that death case, let's say it's Busby or whoever -- I don't even know who would be the person who gets to sign up that case.  And he's going to want to take the deposition.  You know, we're going to obviously want him to be mindful of the fact that depositions have already been taken.  But he's going to want a full-blown deposition.  Mr. Reisman is not going to be able to sit in on that deposition and ask the same questions over again.  That is a given.  And I don't think that you object to that, Mr. Reisman.

MR. REISMAN:  Just to be clear, absolutely.  I would not want to ask the same questions over.  I would want to be there and ask potentially new questions, but not to rehash what's already there.  Once it's in the record, we're fine with what's been developed.

THE COURT:  Okay.  So with that understanding, that's

the limitation that we would put on you in that you're not going to replough this same ground again.

But on the other hand, we can't stop other new parties from coming in and getting the discovery that they are entitled to, and the fact that they haven't appeared yet isn't going to be used against them in that regard.

MR. BARR:  Just one more on the criminal, Your Honor. And again, we haven't seen anything at this point.  But likewise if there were perhaps any concerns down the road for that, they would not be subject to anything criminally if they appeared by Zoom or otherwise for a full-on deposition down the road.  I mean, we've been doing Zoom over COVID and all of that as well.  We still would have that opportunity to be able to just do it all at one shot.  So those video conference means would cover everything that these parties need if for some reason somebody had trepidation to come back to the U.S.

THE COURT:  Mr. Reisman?

MR. REISMAN:  I mean, that's part of it.  But again there's much more to it than that.  And these individuals, are they going to be willing to testify at all knowing that if they ever did come back to the U.S. on a ship, that they potentially have incriminated themselves.  And we don't know if they're going to appear for the video at all.  Again, I give full faith and credit to counsel.  I think they wouldn't have represented it if they didn't mean it.  But they just don't have control

over these individuals.  And with the specter of a potential criminal action, yeah, they may not want to be in the U.S., but they also may not want to testify.  And so if we ever see these people in person or on video, that is a real crapshoot.  And I just don't think a case of this magnitude can afford that risk.

THE COURT:  I would also say that doing translations would be a little bit more difficult as well over Zoom.  So I hear what you're saying.  And it might be that ultimately when you do the next round of depositions, that's going to be how it's done.  But as long as they're already here, we're going to allow these depositions to go forward on the basis that we've discussed here this morning.  And then you guys can write up an order agreeing to the schedules that you want to agree to with whatever provisions that we've discussed here in the order. But regardless of whether it's written in the order or not, you all know what my rulings are.  And so that's how we're going to proceed.

MR. WARNER:  Jud, if I may.

THE COURT: Yes.

MR. WARNER:  Justin Warner on behalf of Mr. Ancar.  I just want to confirm that we will be entitled to attend these depositions and ask questions as necessary if needed. Obviously we've got an interest in this and I would like to be able to take depositions as well.

THE COURT:  Well, I believe that Mr. Barr would want

you to be there because you're one of the other parties who has already filed a lawsuit.  And if whatever schedule that you come up with, if the -- you know, if another case gets filed by then, once that limitation is out there, you know, it could be that -- I don't know that the floodgates are going to be open because there's only a limited number of parties that are interested in this.  But once that limitation gets filed, it could be that the death case will come out and that that's going to be the biggest piece I would think because that's going to be -- other than the damage to the vessel which may -- I don't know what the real damage numbers are for the vessel. It may or may not end up being more than the death case.  But the death case is going to be -- that's going to be a big number.  So we want to get that one on file as quicky as we can.  But yes, Mr. Waner, you will be able to participate.

MR. WARNER:  Thank you.

THE COURT:  so let's turn over to the Ancar case now. And I guess the main big question in that case is you've got -- you want me to file the warrant, to sign all the warrant documents just like that have been signed already in the HSS case, correct?

MR. WARNER:  Yes, Your Honor.  And we filed that at the time.  We filed it.  And then once we filed the verified complaint, we contacted the U.S. deputy in charge, the U.S. Marshal.  He advised the vessel was already under arrest.  So

at that point we decided not to move forward with actually walking through the orders and proceeding with the actual (indiscernible).  I think at this point given that the limitation proceedings aren't even filed, the vessel is already under arrest, I think the Coast Guard has got it here, as well as Mr. Reisman said, I think our motion for arrest is kind of moot at this point, especially considering they've already put up the LOU and the limitation proceeding for I think 23.5 or 22.5.  So with that, you know, in light of all of that that's developed since our filing, I don't think there really needs to be any order on it.  Obviously if things change, we may at that point need to readdress -- you know, come back and address it again with  Your Honor.  But as of right now I don't think there's anything to do.

THE COURT:  Okay.  So all of your stuff is just going to be notated as moot.  And if you want to re-urge it at some point if the vessel sneaks out or, you know, some kind of -- I don't know how a vessel would do that.

MR. WARNER:  Hopefully counsel gives some type of warning before that were to occur.  But no, I don't see that being an issue.

MR. GEORGANTAS:  Your Honor, we can safely represent to you that there will be no sneaking out.

THE COURT:  Yeah.  It would be pretty hard to move a big -- sneak a big vessel out.  But I'm sure that has probably

happened under some kind of cover of darkness or something like that.

MR. GEORGANTAS:  Not that I know of, but I guess anything is possible.

MR. REISMAN:  Dimitri, can you keep us posted though on when you know something about the schedule for the ship? That would be helpful to everybody I think.

MR. GEORGANTAS:  Yeah, David, I think I have been doing that as best I can.  And as far as I know as we are here today, we are at the lay berth.

THE COURT:  Okay.  All right.  So then I think that concludes everything that's before me right now.  Is that correct?

MR. REISMAN:  I believe so, Your Honor.

MR. WARNER:  I believe so, Your Honor.

THE COURT:  All right.  Well, thank you all for coming in and I appreciate everyone's candor and, you know, willingness to cooperate as best we can.  Let's get those papers on up to me, the order.  And then get those consolidations on file as quickly as we can, get your limitations case on file, Mr. Reisman, and let's get this thing buttoned up.  I would really like to have it all done if we can by the end of next week so that everything is -- it's going to be noticed to everyone and everyone's going to know what's going on.

(Hearing adjourned at 11:07 AM)

* * * * *

C E R T I F I C A T I O N

I, Sonya Ledanski Hyde, certified that the foregoing transcript is a true and accurate record of the proceedings.

*Sonya M. Ledanski Hyde*

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date:   August 1, 2024